

# GAS SALES AGREEMENT

This Gas Sales Agreement (this "**Agreement**") is entered into as of 12/02/2015 (the "**Effective Date**") between CenterPoint Energy Services, Inc. ("**Seller**") and the "**Buyer**" identified below for the sale and purchase of natural gas.

Legal name of Buyer: <u>Certified Roses, Inc.</u>

1. <u>Notices</u>.  All notices, requests, claims, demands, Transaction Confirmations (as defined below) and other communications under this Agreement ("**Notices**") must be in writing and, unless the method of delivery is expressly stated otherwise in this Agreement, may be sent via U.S. mail, private courier service, fax machine, or email to the applicable address listed below; however, a party may at any time designate a different address in a Notice to the other party.  A Notice will be considered effective on the date sent if sent via fax machine or email on a Business Day before 5:00 p.m. in the receiving party's time zone (otherwise, on the next Business Day), and on the 2nd Business Day after the date sent if sent via U.S. mail or courier.  "**Business Day**" means any day except Saturday, Sunday or Federal Reserve Bank holidays.

|  | **Buyer's Address:** |  | **Buyer's Address for Invoices:** |
|---|---|---|---|
| <u>Contact:</u> | Jennifer Casteel | <u>Contact:</u> | Accounts Payable |
| <u>Address:</u> | 10076 US Highway 69 N | <u>Address:</u> | PO Box 4400 |
| <u>City/State/Zip:</u> | Tyler, TX 75706-5924 | <u>City/State/Zip:</u> | Tyler, TX 75712 |
| <u>Phone:</u> |  | <u>Phone:</u> |  |
| <u>Fax:</u> |  | <u>Fax:</u> |  |
| <u>Email:</u> |  | <u>Email:</u> |  |
|  | **Seller's Address:** |  |  |
| <u>Contact:</u> | Contract Administration |  |  |
| <u>Address:</u> | 1111 Louisiana Street |  |  |
| <u>City/State/Zip:</u> | Houston, TX 77002 |  |  |
| <u>Phone:</u> |  |  |  |
| <u>Fax:</u> |  |  |  |
| <u>Email:</u> |  |  |  |

2. <u>Agreement Scope</u>.  This Agreement governs all transactions entered into on or after the Effective Date for the purchase by Buyer of natural gas from Seller (each, a "**Transaction**").

3. <u>Agreement Termination</u>.  This Agreement may be terminated by either party at any time after the Effective Date upon 30 days' Notice to the other party if no Transactions are in effect.  This Agreement shall automatically terminate upon the later of 2 years after the Effective Date if no Transactions are in effect at that time, or the last termination date of all such Transactions.  <u>Sections 6, 11, 12, 15 and 20</u> will survive any termination of this Agreement and continue in effect until the rights and obligations therein have been satisfied.

4. <u>Transaction Confirmations</u>.  Before a Transaction becomes binding, Seller shall send a written confirmation of its terms  (a "**Transaction Confirmation**") to Buyer via email as soon as practical after the parties reach agreement on such terms.  A Transaction shall become binding (i) automatically at 5:00 p.m. CST on the 2nd Business Day following the day the Transaction Confirmation is sent to Buyer (the "**Confirm Deadline**") unless a party cancels the Transaction or disputes or revokes the Transaction Confirmation in a Notice to the other party delivered via email prior to the Confirm Deadline, or (ii) on the effective date of Buyer's execution and delivery of Seller's Transaction Confirmation without modification to Seller, whichever occurs first.  A Transaction Confirmation represents the parties' final agreement regarding the specific terms of the Transaction and supersedes any prior oral or written agreements, understandings or promises relating to the Transaction.  In the event of a conflict between the terms of this Agreement and the terms of a Transaction Confirmation, the latter shall control for that Transaction.  Any amendments to a Transaction Confirmation after the Confirm Deadline must be in writing and signed by both parties.

Agreement No:

5. **Transaction Terms**. Each Transaction Confirmation will be labeled with one of the following Transaction designations, based on the Volume Commitment and Contract Price for the Transaction: "Fixed Price," "Volumetric Index Price," "Index Price," or "Market Price" ("**Transaction Type**"), and will specify, at a minimum, Buyer's facility or account that is the subject of the Transaction (the "**Facility**"), the natural gas commodity price (the "**Contract Price**") and any other fees and charges applicable to the Transaction ("**Additional Charges**"), the primary term of the Transaction (the "**Initial Period**") and whether any automatic term renewals apply (each, a "**Renewal Period**" and, together with the Initial Period, the "**Delivery Period**"), the point where Seller will deliver the natural gas to be furnished under the Transaction (the "**Delivery Point**"), the natural gas volumes Seller is obligated to deliver and Buyer is obligated to receive under the Transaction at the Delivery Point (the "**Volume Commitment**"), whether such deliveries and receipts will be Firm or Interruptible (the "**Performance Obligation**"), and the classification of the Transaction as a "forward contract" or "trade option" under Title 7 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("**Dodd-Frank**"). If a Transaction Confirmation does not specify that a Renewal Period applies, but Seller continues to deliver and Buyer continues to receive natural gas after the expiration of the Initial Period specified therein, then the Transaction will be deemed to automatically continue for month-to-month Renewal Periods under the terms of the Transaction Confirmation until terminated by either party on 30 days' Notice, except where the Contract Price during the Initial Period is a fixed price, in which case the Contract Price for natural gas delivered during each such Renewal Period will be the then-current monthly spot price for natural gas in the geographic area where the applicable Delivery Point is located, as determined by Seller in a commercially reasonable manner.

6. **Invoicing and Payment**. Seller shall invoice Buyer on a monthly basis for all Transactions in effect during the invoice period based on the Contract Price, Volume Commitment and Additional Charges, if any, set forth in the respective Transaction Confirmations. Buyer shall pay Seller the full invoice amount in accordance with the payment instructions set forth on the invoice within 15 days of the invoice date (the "**Payment Due Date**"); provided, however, that if the Payment Due Date falls on a non-Business Day, the Payment Due Date shall be the following Business Day. If Buyer, in good faith, disputes the invoice amount, Buyer shall pay the undisputed amount of the invoice and provide documentation to support the disputed amount. If Buyer fails to pay any undisputed invoiced amounts or provide documentation to support any disputed invoiced amounts by the Payment Due Date, Seller may charge and collect from Buyer a late fee equal to the lesser of 1½% of the outstanding balance per month (compounded monthly) or the maximum interest rate allowed by law. Buyer shall pay Seller for all costs and expenses incurred by Seller (including reasonable attorney fees) to collect any past due invoiced amounts. Buyer shall be responsible for and shall pay all taxes and fees assessed by governmental entities on the sale of natural gas hereunder (including any gross receipts taxes and franchise fees). If Buyer is entitled to a tax exemption, it is Buyer's responsibility to provide Seller with any necessary documentation of such. All invoices and associated payments are final unless either party disputes the accuracy of such invoice(s) or payment(s) in writing, with adequate documentation, within 2 years after the invoice date.

7. **Measurement**. The natural gas quantities used for invoicing purposes shall be the actual natural gas quantities measured during the invoice period by the local utility or pipeline company (each, a "**Transporter**") operating the natural gas metering equipment at the applicable Delivery Point or Facility, as reported by the Transporter to Seller (the "**Measured Volumes**"). Either party may contest those measurements, but the Transporter's ultimate determination will be final and binding. In the event the Transporter is unable to provide Seller with the Measured Volumes before Seller's invoice date, the natural gas quantities used for that invoice period will be estimated by Seller, and such estimated quantities will then be adjusted to the Measured Volumes on Seller's next invoice after the Measured Volumes are reported by the Transporter. For any invoice period during which natural gas is delivered from Seller to Buyer under separate Transactions to the same Delivery Point or Facility, Seller shall apply the Measured Volumes for invoicing purposes first to Fixed Price Transaction Types in ascending date order, followed by Volumetric Index Price Transaction Types in ascending date order, then by Index Price Transaction Types in ascending date order, and then by Market Price Transaction Types in ascending date order.

8. **Credit Terms**. Buyer must meet Seller's creditworthiness standards at all times. Buyer shall provide to Seller, as Seller may request from time to time, sufficient information to enable Seller to determine Buyer's creditworthiness, including, but not limited to, financial statements and trade references. If Buyer does not meet Seller's creditworthiness standards, Seller may require that Buyer provide sufficient credit support for Buyer's payment obligations under this Agreement, in the form and amount, and for a term, reasonably acceptable to Seller. Buyer authorizes Seller to obtain Buyer's usage data and credit history from any Transporter serving Buyer's Facilities and appoints Seller as its agent solely for the purpose of obtaining such usage data and credit history, to the extent such agency authority is necessary. Each party agrees that this clause supersedes and replaces in their entirety any requirements of law relating to adequate assurance of future performance, including without limitation Article 2 of the Uniform Commercial Code.

9. **Performance Breach**. As used in this Agreement, "**Firm**" means that either party may interrupt its performance without liability only to the extent that such performance is excused by a Force Majeure Event (as defined below), and "**Interruptible**" means that either party may interrupt its performance at any time for any reason without liability. Except as provided in Section 10 of this Agreement, and unless a different remedy for breach of a Firm obligation is specified in a Transaction Confirmation, the sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive natural gas not excused by a Force Majeure Event is, in addition to the payment or reimbursement of any Transporter imbalance charges or penalties caused by such breach, as follows: (a) in the event of a breach by Seller on any day, Seller shall pay Buyer an amount (that amount, "**Seller's Breach Payment**") equal to the difference between the Volume Commitment for that day and the actual quantity delivered by Seller to the Delivery Point during that day, multiplied by the positive difference, if any, obtained by subtracting the Contract Price from the spot price for natural gas for that day in the geographic area where the applicable Delivery Point is located, as determined by Seller in a commercially reasonable manner (the "**Daily Spot Price**"); and (b) in the event of a breach by Buyer on any day, Buyer shall pay Seller an amount (that amount, "**Buyer's Breach Payment**") equal to the difference between the Volume Commitment for that day and the actual quantity received by Buyer at the Delivery Point during that day, multiplied by the positive difference, if any, obtained by subtracting the Daily Spot Price from the Contract

Price.  Seller shall apply a credit in the amount of Seller's Breach Payment, if any, and a charge in the amount of Buyer's Breach Payment, if any, in the invoice(s) covering the day(s) of the breach.

10. Early Termination.  (a) Either party may (i) terminate a Transaction if the other party fails to perform a Firm obligation to make or take delivery of natural gas pursuant to the terms thereof for a period of more than 30 consecutive days regardless of whether such failure is otherwise excused by a Force Majeure Event, or if the Facility that is the subject of the Transaction is served by a utility company and becomes ineligible for utility transportation service regardless of whether such ineligibility is otherwise excused by a Force Majeure Event, and (ii) terminate this Agreement and all Transactions then in effect if the other party or its guarantor files or has filed against it a petition for relief under the United States Bankruptcy Code or similar state law for the protection of creditors, or otherwise becomes bankrupt or insolvent, has a receiver or similar official appointed with respect to it or substantially all of its assets, makes an assignment or any general arrangement for the benefit of creditors, or is unable to pay its debts as they fall due.

(b)  In addition, Seller may terminate this Agreement and all Transactions then in effect if Buyer or its guarantor (i) fails to pay any invoice amount not subject to a good faith dispute on or before 15 days following the invoice's Payment Due Date; (ii) fails to provide credit support in accordance with Seller's request under Section 8 hereof on or before the end of the 2nd Business Day following such request; or (iii) fails to perform any obligation owed to Seller with respect to any credit support provided under Section 8 hereof.

(c)  The party having the right to terminate under this Section (the "**Non-Defaulting Party**") shall give Notice of termination to the other party (the "**Defaulting Party**"), and such termination will be effective upon the effective date of the Notice, unless a later termination date is designated in the Notice, in which case the termination will be effective upon such later termination date (the ""**Early Termination Date**"), which later date must be no later than 20 days after the effective date of the termination Notice; provided, however, that to the extent the right to terminate under this Section has accrued and is continuing, the Non-Defaulting Party may also immediately suspend all delivery and payment obligations owed under the Terminated Transactions (as defined below).

11. Early Termination Damages.  (a)  If one or more Transactions are terminated pursuant to Section 10 of this Agreement (the "**Terminated Transactions**"), the Non-Defaulting Party shall, as soon as reasonably practicable after the Early Termination Date, liquidate and accelerate the outstanding Volume Commitments under each Terminated Transaction (the sum thereof, the "**Outstanding Volumes**") as of the Early Termination Date at the market price for similar transactions at the affected Delivery Point(s) (the "**Market Price**"), as determined by the Non-Defaulting Party in a commercially reasonable manner.  If the product of the Outstanding Volumes times the Market Price (that product, the "**Market Value**") is greater than the product of the Outstanding Volumes times the Contract Price (that product, the "**Contract Value**"), then the positive difference between them, as discounted by the Non-Defaulting Party to present value in a commercially reasonable manner as of the Early Termination Date, (the "**Liquidated Damages**") will be owed to Buyer, and if the Contract Value is greater than the Market Value, then the Liquidated Damages will be owed to Seller.

(b)  The Non-Defaulting Party shall, as soon as reasonably practicable after determining the Liquidated Damages amount, (i) net or aggregate, as appropriate, the Liquidated Damages amount against or with (A) all outstanding payment obligations owed between the parties under the Terminated Transaction(s) as of the Early Termination Date (including any Buyer's or Seller's Breach Payment) for which payment has not been paid, (B) any and all costs and penalties imposed by a Transporter or other third party on the Non-Defaulting Party as a result of the early termination, (C) any brokerage fees, commissions and other similar transaction costs and expenses reasonably incurred by the Non-Defaulting Party either in terminating any arrangements undertaken to hedge its obligations under the Terminated Transactions or in entering into new arrangements to replace the Terminated Transactions, and (D) reasonable attorneys' fees and court costs, if any, incurred by the Non-Defaulting Party in connection with enforcing its rights with respect to the Terminated Transactions, so that all such amounts are netted or aggregated to a single liquidated amount payable by one party to the other (the "**Net Settlement Amount**") and (ii) notify the Defaulting Party thereof.  The party owing the Net Settlement Amount shall pay it in full within 15 days after the date of that Notice.  Interest on any unpaid portion of the Net Settlement Amount shall accrue from the date due until the date of payment at the rate set forth in Section 6 of this Agreement.

12. Risk of Loss, Indemnification and Disclaimer of Implied Warranties.  For each Transaction, title to and risk of loss for the natural gas will pass to Buyer at the Delivery Point.  Seller shall indemnify Buyer and save it harmless from all losses, liabilities, damages and demands including reasonable attorneys' fees and costs of court ("**Losses**") arising from or out of claims of personal injury, including any wrongful death action, or property damage from said natural gas ("**Claims**") that attach before title to said natural gas passes to Buyer, and Buyer shall indemnify Seller and save it harmless from all Losses arising from or out of Claims that attach after title to said natural gas passes to Buyer.  These indemnity obligations do not apply if Buyer is a governmental entity. SELLER EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES, WHETHER STATUTORY OR COMMON LAW, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

13. Assignment.  Neither party may assign this Agreement without the other party's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, except that either party may assign this Agreement after Notice to the other party, so long as (a) in the case of an assignment by Seller, such assignment is to an Affiliate or a successor resulting from a merger or the acquisition of substantially all of Seller's assets, and (b) in the case of an assignment by Buyer, (i) such assignment is to an Affiliate or a successor resulting from a merger or the acquisition of substantially all of Buyer's assets and (ii) such Affiliate or successor meets Seller's creditworthiness standards as determined by Seller prior to any such assignment taking effect.  In no event may either party sever a Transaction, or any portion of its rights or obligations to receive or deliver natural gas under a Transaction, from this Agreement and transfer such Transaction or such rights or obligations

Agreement No: ▇▇▇

separately from the remainder of the Transaction or this Agreement without the consent of the other party. Any attempted assignment in violation of this Section will be null and void and without effect. This Agreement will be binding on the parties' respective permitted successors and assigns. "**Affiliate**" means an entity that controls, is controlled by, or is under common control with, the assigning party.

14. Force Majeure. To the extent either party is prevented by a Force Majeure Event from carrying out, in whole or part, its obligations under a Transaction and such party (the **"Claiming Party"**) gives Notice and details of the Force Majeure Event to the other party as soon as practicable, then the Claiming Party shall be excused from the performance of its obligations with respect to such Transaction (other than the obligation to make payments that are otherwise due and payable under this Agreement). The Claiming Party shall use commercially reasonable efforts to remedy its inability to perform as a result of the Force Majeure Event. "**Force Majeure Event**" means an event or circumstance which prevents one party from performing its obligations under a Transaction, which event or circumstance is not within the reasonable control of, or the result of the negligence of, the Claiming Party, and which, by the exercise of reasonable diligence, the Claiming Party is unable to overcome. Force Majeure Events include, but are not limited to, the following: (i) physical events such as acts of God, landslides, lightning, earthquakes, fires, storms or storm warnings, such as hurricanes, which result in evacuation of the affected area, floods, washouts, explosions, breakage or accident or necessity of repairs to machinery or equipment or lines of pipe; (ii) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe; (iii) interruption, termination and/or curtailment of Firm transportation and/or storage by Transporters; (iv) acts of others such as strikes, lockouts or other industrial disturbances, riots, sabotage, insurrections or wars, or acts of terror; and (v) governmental actions such as necessity for compliance with any court order, law, statute, ordinance, or regulation (including but not limited to a tariff regulation in a Transporter's tariff).

15. Limitation of Liability. FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED, A PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY, AND NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES UNDER ANY INDEMNITY PROVISION OR OTHERWISE. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

16. Forward Contract. The parties agree that each Transaction constitutes a "forward contract," that Seller and Buyer are each "forward contract merchants" and that this Agreement constitutes a "master netting agreement," in each case within the meaning of the United States Bankruptcy Code.

17. Dodd-Frank Transaction Classification. Each party represents as of each time it enters into a Transaction that the Transaction qualifies for either (a) the forward contract exclusion as set forth under Section 1a(47)(B)(ii) of the Commodity Exchange Act or (b) the trade option exemption as set forth under 17 C.F.R. Section 32.3(a). Each party shall promptly give Notice to the other party if the foregoing representation becomes incorrect or misleading. If a Transaction is subject to any governmental reporting requirements, including but not limited to any reporting requirements of the Commodity Futures Trading Commission enacted under Dodd-Frank, each party shall provide the other party any information reasonably requested by such other party to enable it to comply with those requirements.

18. Buyer Representations. Buyer represents and warrants to Seller, as of the Effective Date and the date of each Transaction Confirmation, that it (a) is acting for its own account; (b) has made its own independent decision to enter into this Agreement and each Transaction and as to whether this Agreement and each such Transaction is appropriate or proper for it based upon its own judgment; (c) is not relying upon the advice or recommendations of Seller in so doing; (d) is capable of assessing the merits of and understands and accepts, the terms, conditions and risks of this Agreement and each Transaction; (e) understands that information and explanations of the terms and conditions of each such Transaction shall not be considered investment or trading advice or a recommendation to enter into that Transaction; (f) understands that no communication (written or oral) received from Seller shall be deemed to be an assurance or guarantee as to the expected results of that Transaction; and (g) understands that Seller is not acting as a fiduciary for or an advisor to it in respect to that Transaction.

19. Market Disruption. If a Market Disruption Event occurs, the parties shall negotiate in good faith to agree on a replacement price for the Floating Price, or on a method for determining a replacement price, for the affected day. If the parties cannot agree on a replacement price before the 2nd Business Day following the Market Disruption Event, then each party shall obtain, in good faith and from non-affiliated market participants in the relevant market, 2 quotes for prices of natural gas for the affected day, similar in quality and quantity in the geographical location closest in proximity to the Delivery Point, within the next 2 Business Days. Seller shall average, rounded to the third decimal place, the 4 quotes, to determine the replacement price. If either party fails to provide 2 quotes then the average of the other party's 2 quotes shall determine the replacement price. "**Floating Price**" means the price or a factor of the price, based on a specified index, agreed to in a Transaction as the Contract Price. "**Market Disruption Event**" means, relating to an index specified in a Transaction, any of the following events: (a) the failure of the index to announce or publish information necessary for determining the Floating Price; (b) the failure of trading to commence or the permanent discontinuation or material suspension of trading on the exchange or market acting as the index; (c)

the temporary or permanent discontinuance or unavailability of the index; (d) the temporary or permanent closing of any exchange acting as the index; or (e) both parties agree that a material change in the formula for or the method of determining the Floating Price has occurred.

20. **Miscellaneous.** This Agreement and its terms are considered confidential by each party hereto and may not be disclosed to third parties except to the extent disclosure is necessary for its implementation or otherwise required by law, and except to such party's or its Affiliate's employees, auditors, lawyers or other agents or advisors or prospective lenders, investors or purchasers of all or substantially all of such party's assets or any of its rights under this Agreement provided such persons are required to keep the information that is disclosed in confidence. No waiver or forbearance of any provision of this Agreement shall be held to be a waiver or forbearance or require a waiver or forbearance in the future. Any portion of this Agreement which may be deemed to be unenforceable or illegal shall not affect the enforceability or legality of its remaining terms and conditions. This Agreement shall not be construed as creating any third party beneficiaries hereof.

21. **Entire Agreement, Amendment and Construction.** This Agreement constitutes the entire agreement between Buyer and Seller regarding the subject matter herein, superseding any and all prior written or oral agreements and promises. This Agreement, all Transaction Confirmations and any designated credit support agreement or arrangement between the parties (including any amendments to any of the foregoing) shall be construed as a single integrated agreement. This Agreement cannot be amended except by written instrument signed by both parties.

By signing below, each individual represents and warrants that he/she is authorized to sign this Agreement on behalf of the party for which it was executed.

Seller: CenterPoint Energy Services, Inc.
By: _____
Print Name: Jeff Wiese
Title: V.P.

Buyer: Certified Roses, Inc.
By: _____
Print Name: Lawrence Valdez
Title: LEO



**Transaction Confirmation**
**Transaction Type: Index Price**

Transaction Confirmation Number: ▮
Gas Sales Agreement Number: ▮

Date: 12/02/2015

This Transaction Confirmation sets forth the terms of the Transaction agreed to under Gas Sales Agreement, No. ▮ (the "Agreement"). Capitalized terms used and not otherwise defined in this Transaction Confirmation shall have the respective meanings ascribed to such terms in the Agreement. **The terms of this Transaction Confirmation are binding on both Buyer and Seller unless disputed in writing per the Agreement.**

| | |
|---|---|
| Buyer: | Certified Roses, Inc. |
| Buyer's Facilities: | See below |
| Seller: | CenterPoint Energy Services, Inc. |
| Seller Contact: | Leslie Morgan |
| Seller Contact Email: | |
| Dodd-Frank Transaction Classification: | Forward Contract |

| | |
|---|---|
| Contract Price and Volume Commitment | Inside FERC's Gas Market Report, Market Center Spot Gas Prices, "East Texas, Houston Ship Channel" Index plus $0.30/MMBtu for full requirements up to 70 MMBtus per day. |
| Additional Fees or Contract Price adjustments: | Applicable Taxes<br>Utility Transportation: passed through at cost<br>Telemetry installation and maintenance as needed for any applicable Utility rate requiring telemetry<br>Upstream Transportation: Applicable upstream pipeline transportation fees |
| Initial Period: | This Transaction Confirmation shall be in effect starting 01/01/2016 and will continue for 12 months ("Initial Period"), unless otherwise terminated in accordance with the Agreement. |
| Renewal Period: | This Transaction Confirmation shall be in effect for the Initial Period set forth above, and will automatically renew or extend for successive 12 month periods (each a "Renewal Period") unless either party terminates this Transaction Confirmation by providing the other party with written notice at least 30 days prior to the end of the Initial Period or any Renewal Period, as applicable, or otherwise terminated in accordance with the Agreement. |
| Delivery Point: | Buyer's Facility(ies) |
| Performance Obligation: | The delivery will be firm. |
| Special Conditions: | |

**Buyer's Facilities:**
Account numbers are accurate as of the Date above and may be modified by Utility/Pipeline

| Facility Name | Account Number | Meter Number | Address | City | State |
|---|---|---|---|---|---|
| Certified Roses, Inc. | ▮ | ▮0093 | 10076 US Highway 69 N | Tyler | TX |
| Certified Roses, Inc. | ▮ | ▮0859 | 10076 US Highway 69 N | Tyler | TX |
| Certified Roses, Inc. | ▮ | ▮0705 | 10076 US Highway 69 N | Tyler | TX |
| Certified Roses, Inc. | ▮ | ▮2182 | 10076 US Highway 69 N | Tyler | TX |

Seller: CenterPoint Energy Services, Inc.
By: _/s/_
Print Name: Jeff Wiese
Title: V.P.

Buyer: Certified Roses, Inc.
By: _/s/_
Print Name: Lawrence Valdez
Title: CEO